Filed 9/11/23  P. v. Roman CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>SERGIO LOPEZ ROMAN,<br><br>        Defendant and Appellant. | A164943<br><br>(Humboldt County Super. Ct.<br> No. CR2000417) |

After defendant Sergio Lopez Roman had a physical altercation with his uncle, a jury convicted Roman of one felony count of assault by means of force likely to produce great bodily injury (GBI).  The jury also found true the allegations that Roman personally inflicted GBI on his uncle and personally used a deadly or dangerous weapon during the assault.  The trial court sentenced Roman to six years in prison.

On appeal, Roman contends that reversal is required because (1) the trial court erred by instructing the jury on flight and (2) his trial counsel provided ineffective assistance of counsel.  We reject both claims and affirm.

1

# I.
## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Fight Between Roman and His Uncle*

Around 7:00 p.m. on January 10, 2020, Roman's 62-year-old uncle (uncle) left his Eureka home and walked around the corner to the house of his sister, Roman's mother (mother). Uncle visited nightly to help mother, who was in her late 70's and had health issues, by feeding her, cleaning up, and putting her to bed.

At the time, 52-year-old Roman lived with his older brother in a converted garage on mother's property. Uncle and Roman, who testified in his own defense, agreed that they had a good relationship when Roman was growing up. According to uncle, they no longer got along because Roman would not help with mother's care. Roman claimed to have had "no idea" that uncle "had a problem" with him.

Uncle testified that as he was putting mother to bed, he saw Roman enter the living room, and the two made eye contact. Roman "was yelling something like he was mad" and "calling somebody names." Uncle was not sure whether Roman was addressing him, and he ignored Roman while he continued to help mother. About five minutes later, uncle noticed that Roman had left.

Uncle testified that he spent another 15 minutes or so at mother's house, until about 9:00 p.m. He then exited the house onto a concrete patio, which was bordered on one side by the unit where Roman lived. To leave the property, it was then necessary to travel a narrow path around the back of a third building that faced Roman's residence. When uncle came outside, he saw Roman standing on the path, blocking his way. Roman, who was "[j]umping . . . like he was getting pumped up," told uncle, "Come on. Let's

2

fight." Uncle responded, "Are you serious?" Roman then approached him and "started throwing punches" at his head.

Uncle testified that the fight began on the path but moved to the patio. After Roman threw the first punches, uncle blocked them, "sw[u]ng back," and kicked his nephew. Roman fell down, and uncle "thr[e]w a couple punches" but then "let him get up." Once Roman was standing again, uncle noticed that Roman "was swinging kind of different" with a "shorter motion." Uncle then felt his leg become warm, looked down, and saw that his "shoe was all full of blood." At that point, uncle believed that Roman had "stabbed" him, although it was dark and uncle never saw the weapon. Uncle backed away and went home. He testified that walking was "painful" and he was "bleeding a lot."

Roman described the fight differently. He testified that he went to mother's house that night to drop off her mail. Once inside, he yelled to mother that he had her mail and put it on the counter. When he looked up, uncle was standing there and gave him "an angry, disgusting look . . . that was not very friendly." Roman testified that he "scoffed" in response "like, yeah, whatever." Uncle then got close to Roman with "his chest in [Roman's] face," which Roman perceived as an "aggressive gesture." According to Roman, after he told uncle it seemed like he wanted to fight, they went outside. Both men took off their glasses and "face[d] off," and uncle initiated physical contact by grabbing Roman's neck.

Roman claimed that after the fight started, he and uncle both fell to the ground and were "rolling" around on the patio. Roman categorically denied having a knife. Instead, he claimed that uncle was injured because he "land[ed] . . . real good" on some rebar that was sticking out of the ground. Roman denied that he ever had physical control of uncle during the fight or

3

intentionally pushed uncle into the rebar.  Roman claimed that he also hurt himself on the rebar, testifying that he "got full of holes in [his] back," had "scrapes and cuts and bruises all over [his] arm and [his] side," and "couldn't move for three days [he] was so hurt."

Uncle testified that he "never went to the ground," and he denied sustaining any wounds by falling on rebar.  Indeed, he was not aware of any exposed rebar on the patio.  But photographs admitted into evidence, which we have reviewed, show four pieces of rebar in a line along one edge of the patio, about four inches from the wall of one of the property's structures.  None of the pieces, which are rusty and circular, protrude more than an inch or so from the concrete.  Three pieces are about 18 inches away from each other, and the fourth is about three feet farther away, past where the wall ends.  A prosecution investigator who took some of the photographs testified that he "did not observe anything [at the scene] that would appear to be able to make . . . a puncture wound" like those uncle sustained.

B.      *The Fight's Aftermath*

Uncle's wife testified that after uncle got home, "[t]here was blood everywhere," including on the sidewalk and his shirt.  She immediately drove him to the hospital.  On the way, uncle "was losing a lot of blood," and by the time they reached the hospital he could "[b]arely" walk.

A three-page excerpt of uncle's hospital records admitted into evidence referred throughout to uncle's "stab wounds," including the statement that uncle had "1.5 cm stab wounds to the left elbow, left upper arm, left lateral thigh, left anterior thigh."  Photographs of uncle taken at the hospital show rectangular wounds with curved edges, some deeper than others.  Some of uncle's clothing was removed from his body, and photographs of the material

4

show at least one curved cut through it.  Uncle was released the following morning and recovered fully within a few weeks.

Around 10:15 p.m. that night, a Humboldt County sheriff's deputy was dispatched to the hospital where uncle being treated.  The deputy described uncle's wounds as "a series of small[,] approximately one-inch cuts on the left side of his body between his left arm and his left leg. . . .  They were thin and it appeared that they were from a thin[-]bladed object, very similar [to] a knife."  The deputy also referred to the cuts as "puncture" wounds.

Later that night, the deputy went to the scene to investigate.  Roman's brother was there and reported that he heard Roman and uncle fighting but did not see the altercation.[1]  The brother stated that "he was missing a steak knife from his [knife] block in his kitchen" and allowed the deputy inside to see.  A photograph of the knife block taken that night shows three out of six steak knives missing.  The deputy also saw blood on the patio, although it was raining and the blood was starting to disappear.  Photographs taken that night show red splotches at various places on the ground in that area.

Meanwhile, Roman was not at the scene, and a warrant was issued for his arrest.  The sheriff's deputy testified that "[o]nce [he] returned to the office," he called a phone number he was given for Roman, but no one answered.  The record does not indicate whether the deputy left a message or tried to call Roman again.

Roman testified that before law enforcement arrived, he went to a friend's house.  The friend was not home, and Roman used "gorilla tape and glue" on his injuries.  Roman did not seek medical treatment, document his injuries, or show them to anyone else.  He also threw away the clothes he was

---

[1] Roman's brother was not available to testify, as he died of COVID-19 shortly before trial.

wearing that night because they were "all wet and tattered." Roman claimed that he "didn't have [his] cell phone on [him] at the time." Though he got it back in the "[n]ext day or two," he "[d]idn't know" that law enforcement was trying to reach him.

C. *Procedural History*

Roman was charged with one felony count of assault by means likely to produce GBI. It was also alleged that he personally used a deadly and dangerous weapon, a knife, and that he inflicted GBI on uncle. Finally, a prior strike was alleged based on a 1998 conviction for grossly negligent discharge of a firearm.[2]

The jury found Roman guilty of the assault charge and accompanying allegations. After finding the prior-strike allegation true, the trial court granted Roman's *Romero* motion to dismiss it.[3] The court then sentenced him to six years in prison, composed of the midterm of three years for the assault and a consecutive term of three years for the infliction of GBI.[4]

---

[2] The assault charge was brought under Penal Code section 245, subdivision (a)(4). The weapon allegation was made under Penal Code section 12022, subdivision (b)(1), and the GBI allegation was made under Penal Code section 12022.7, subdivision (a). The prior-strike allegation was made under Penal Code section 667, based on a conviction for a serious felony under Penal Code section 246.3. All further statutory references are to the Penal Code unless otherwise noted.

[3] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).

[4] No term was imposed for the weapon enhancement. At sentencing, the defense suggested only one enhancement could be imposed under Senate Bill No. 81 (2021–2022 Reg. Sess.), which amended section 1385 in various respects. Although the trial court never indicated it was dismissing the weapon enhancement pursuant to section 1385, we will assume that the court properly decided not to impose a term for that enhancement.

## II.
### DISCUSSION

*A.    The Trial Court Properly Instructed the Jury on Flight.*

Roman claims that the trial court erred by giving CALCRIM No. 372, the form jury instruction on flight, because there was insufficient evidence that he fled from the scene.  We conclude there was substantial evidence of flight to support the instruction, and even if there had not been, the error in giving the instruction was harmless.

### 1.    Additional facts

The prosecution asked that the jury be instructed under CALCRIM No. 372 based on the evidence that Roman left the scene after the fight. Roman's trial counsel objected, stating that "[f]light is to avoid prosecution, avoid arrest," and the instruction does not apply when there "was a fight and each party went their own way."  After confirming the prosecution intended to rely on Roman's departure as evidence of guilt, the trial court determined that although the jury could find that the fact he left was insignificant, it could also reasonably infer that he "was acting with the purpose of avoiding arrest."  Thus, the court decided to give the instruction.

The jury was instructed under CALCRIM No. 372 as follows:  "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt.  If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

### 2.    Analysis

Roman argues that the trial court erred by instructing the jury under CALCRIM No. 372 because there was insufficient evidence that he left the scene with the intent to avoid detection.  He is incorrect.

Section 1127c requires a trial court to give a flight instruction "where evidence of flight . . . is relied upon as tending to show guilt." (§ 1127c; *People v. Howard* (2008) 42 Cal.4th 1000, 1020.)  In such cases, the statute requires the court to "instruct the jury substantially as follows:  The flight of a person immediately after the commission of a crime, or after [the person] is accused of a crime that has been committed, is not sufficient in itself to establish [the person's] guilt, but is a fact which, if proved, the jury may consider in deciding [the person's] guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine." (§ 1127c.)  "CALCRIM No. 372 is merely a distillation of the instructional duty imposed . . . by . . . section 1172c." (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 499 (*Pettigrew*).)

" 'In general, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that [the defendant's] movement was motivated by a consciousness of guilt." [Citations.]  " '[F]light requires neither the physical act of running nor the reaching of a far-away haven.  [Citation.]  Flight manifestly does require, however, a purpose to avoid being observed or arrested.' " ' " (*People v. Leon* (2015) 61 Cal.4th 569, 607.)  "Evidence that a defendant left the scene is not alone sufficient." (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.)

Section 1127c notwithstanding, "it is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)  There must be " 'substantial evidence of flight by the defendant . . . from which the jury could reasonably infer a consciousness of guilt.' " (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1245.)  Thus, the evidence supporting a flight instruction can be contradicted (*People v. Richardson* (2008) 43 Cal.4th 959, 1020), and

8

"[a]lternative explanations for flight conduct go to the weight of the evidence, which is a matter for the jury . . . to decide." (*People v. Rhodes* (1989) 209 Cal.App.3d 1471, 1477.) We independently review the trial court's finding that substantial evidence supported the instruction. (See *People v. Quiroz* (2013) 215 Cal.App.4th 65, 76.)

According to Roman, the only evidence supporting the flight instruction was the sheriff deputy's testimony that Roman was not present when the deputy arrived at the scene and did not return the deputy's phone call. Were this the only evidence of flight, we might agree with Roman that it was insufficient to suggest that he left the scene because he harbored a consciousness of guilt. As he points out, the deputy's testimony did not establish the timing or circumstances of his departure. And although the deputy testified that he "did not get an answer" when he called Roman's phone, there is no evidence that the deputy left a message or tried to contact Roman again. Standing alone, a single missed call to a suspect is hardly suggestive of flight.

Nonetheless, we conclude that Roman's own testimony constituted substantial evidence to support the flight instruction. Roman claimed that he was seriously injured during the fight, yet he did not leave the scene to seek medical treatment. Instead, he went to an unoccupied location to tend to his wounds even though he could have stayed at the scene, where he lived, to do so. Indeed, by going to the other location, Roman ensured that no one else saw his supposed injuries, enabling his later story about the rebar. Moreover, he claimed that he did not have his cell phone for a day or two after the altercation, permitting the conclusion that he was hiding out or at least trying to avoid communicating with law enforcement. Even though there could have been innocent explanations for Roman's departure and

9

inability to be reached, under the totality of the circumstances the jury could have reasonably inferred that he left to avoid detection.

Even if there had been insufficient evidence to support the flight instruction, however, we would conclude that the error was harmless. Roman cursorily claims that the purported error "amounted to federal constitutional error because it relieved the prosecution of its burden to prove each element beyond a reasonable doubt," but our state Supreme Court has rejected that argument. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1223–1224.) Rather, we review this type of error for prejudice under the state-law standard, asking whether it was "reasonably probable [the defendant] would have fared any better had the trial court not given the flight instruction." (*Pettigrew*, *supra*, 62 Cal.App.5th at p. 502; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

We agree with the Attorney General that any potential prejudice from the purported error was minimized because of other aspects of the jury instructions. CALCRIM No. 372 itself does not assume that flight is established, instructing the jury that "*[i]f* you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct." (Italics added.) Also, the jury was instructed under CALCRIM No. 200 that some of the instructions read "may not apply, depending on [the jury's] findings about the facts of the case." Thus, the jury was informed that it had "to decide for itself" whether Roman's departure from the scene "had any relevance when deciding guilt and . . . if it decided the evidence was irrelevant, it knew to disregard the flight instruction." (*Pettigrew*, *supra*, 62 Cal.App.5th at p. 502.)

Moreover, the evidence of Roman's guilt was strong. Although Roman argues that "[t]his was a close case that turned on a credibility battle between" himself and uncle, uncle's version of events was corroborated by

significant other evidence. Uncle's wounds were well-documented, and they were consistent with his story of being stabbed. Having reviewed the photographs of those injuries and the rebar, we do not think any reasonable juror could have believed that uncle sustained several wounds to one side of the front of his body by rolling around on rebar that was so close to the wall. In contrast, the only evidence that Roman was injured at all was his own testimony. And even if his testimony that the two men went to the ground and were injured by the rebar is otherwise credited, there is no apparent reason that Roman's injuries—which he described as "holes in [his] back"— would be so different from uncle's. Finally, whereas Roman's testimony was uniformly self-serving, uncle admitted that he never saw a knife, something he could be expected to lie about if he were fabricating other parts of his story.

In short, even if insufficient evidence supported the flight instruction, there is no reasonable probability of a better result had the instruction not been given. Roman's claim of instructional error fails.

B.    *Roman Is Not Entitled to Relief Based on Ineffective Assistance of His Trial Counsel.*

Roman also claims that his trial counsel rendered ineffective assistance in numerous respects.[5] Roman contends that even if counsel's errors were individually "just a slip of the mind, when viewed as a whole," they require reversal.

---

[5] The attorney who is the subject of this claim was retained by Roman and represented him through trial. After the verdict was returned, Roman fired the attorney, and a public defender was appointed to represent Roman at sentencing. Our references to defense counsel are to Roman's original attorney, not the public defender.

We are not persuaded.  Roman has hampered our consideration of this claim by alleging a long laundry list of instances when defense counsel's performance was supposedly objectionable.  Most of the instances about which Roman complains did not amount to deficient representation, much less the complete absence of a defense.  As a result, we do not consider them in determining whether defense counsel's errors were cumulatively prejudicial.   As for the two purported errors that are more concerning— defense counsel's odd voir dire and his failure to object to the hospital records' references to "stab wounds"—we need not definitively resolve whether they were professionally unreasonable.  Even if we assume they were, there was no reasonable probability of a better outcome had they not occurred.

      1.     General legal standards

A criminal defendant has the right to effective assistance of counsel under the Sixth Amendment of the United States Constitution and article I, section 15 of the California Constitution.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); *In re Long* (2020) 10 Cal.5th 764, 773.)  To prevail on a claim of ineffective assistance of counsel, a defendant must show "that counsel's performance was deficient," such that "counsel was not functioning as the 'counsel' [constitutionally] guaranteed," and "the deficient performance prejudiced the defense."  (*Strickland*, at p. 687; *People v. Centeno* (2014) 60 Cal.4th 659, 674.)  Thus, a defendant must demonstrate both (1) that "counsel's performance . . . fell below an objective standard of reasonableness under prevailing professional norms" and (2) that there is "a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different."  (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

12

In evaluating a claim of ineffective assistance of counsel, "a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance." (*Mai, supra*, 57 Cal.4th at p. 1009; *People v. Centeno, supra*, 60 Cal.4th at pp. 674–675.) "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (*Strickland, supra*, 466 U.S. at p. 689.) Many trial decisions are tactical matters and will rarely establish incompetent performance, such as whether to object to evidence (*People v. Freeman* (1994) 8 Cal.4th 450, 490–491 (*Freeman*)), how to cross-examine witnesses (*People v. Carrasco* (2014) 59 Cal.4th 924, 986), and what to say in closing argument (*Yarborough v. Gentry* (2003) 540 U.S. 1, 5–6 (*Yarborough*)).

On appeal, a defendant "must establish deficient performance based on the four corners of the record." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003.) Given the presumption that counsel performed reasonably, this means that "[o]n direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*Mai, supra*, 57 Cal.4th at p. 1009.) The normal rules about demonstrating error on appeal, including the requirement to "present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error," also apply. (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

13

A reviewing court need not determine whether counsel's performance fell below professional standards if the defendant fails to demonstrate "prejudice . . . as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which . . . will often be so, that course should be followed." (*Strickland*, *supra*, 466 U.S. at p. 697.) The defendant " 'must establish "prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel," ' " and " '[t]he incompetence must have resulted in a fundamentally unfair proceeding or an unreliable verdict.' " (*In re Cox* (2003) 30 Cal.4th 974, 1016; *In re Hardy* (2007) 41 Cal.4th 977, 1019.) Counsel's errors may be cumulatively prejudicial even if they do not individually require reversal. "In examining whether the cumulative effect of defense counsel's errors . . . undermines our confidence in the outcome," we consider only the performance that we find or assume to be inadequate. (*In re Jones* (1996) 13 Cal.4th 552, 583.)[6]

2. Alleged errors that did not constitute deficient performance

We begin by discussing the challenged aspects of defense counsel's performance that Roman fails to demonstrate were unreasonable under prevailing professional norms.

a. *The defense's opening statement*

Roman claims that defense counsel rendered ineffective assistance by giving "a defective opening statement." Roman complains that the statement

---

[6] There are limited situations in which counsel's deficient performance is presumed to be prejudicial, including where " ' "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." ' " (*People v. Ruiz* (2023) 89 Cal.App.5th 324, 329–330, quoting *United States v. Cronic* (1984) 466 U.S. 648, 659.) Although Roman states that defense counsel's errors amounted to "the absence of a defense," he does not argue that prejudice must be presumed.

14

"paid lip service to reasonable doubt, but did not explain what might create reasonable doubt," and in particular did not mention the rebar as "an alternative theory for [uncle's] injuries." We disagree that the statement was deficient for these reasons.

To be sure, the opening statement was brief. Defense counsel began by emphasizing jurors' important role in the justice system and their "promise to listen carefully, consider all the evidence, and not rush to any conclusions." Counsel then stated that uncle would testify that he did not see a knife, "[w]hich raises reasonable doubt and reasonable doubt is what the defense case is all about. We think that the People, however diligent they are, will not be able to overcome the reasonable doubt." He said he expected that law enforcement and medical personnel would provide testimony that would be "interesting and compelling," but he emphasized that they were not eyewitnesses to the fight. Finally, counsel returned to the standard of proof, distinguishing the American system from those "where the accused has to prove their innocence" and reiterating that the People had the burden to prove guilt beyond a reasonable doubt.

An opening statement's brevity is not objectionable in and of itself: "Length . . . does not necessarily equate with quality." (*People v. Jennings* (1991) 53 Cal.3d 334, 381.) Indeed, whether to give an opening statement at all is a "matter[] of trial tactics and strategy which a reviewing court generally may not second-guess." (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1059; *People v. Carrasco, supra*, 59 Cal.4th at p. 987.) Turning to the information supposedly missing from the opening statement, we disagree with Roman that defense counsel's discussion of reasonable doubt was deficient. Counsel repeatedly emphasized the prosecution's standard of proof, and he stated that uncle's failure to see a knife created reasonable doubt. In

15

addition, counsel could have had rational reasons for not mentioning the rebar, such as if it was not yet clear whether Roman—who laid the foundation for the rebar evidence—would testify. Thus, Roman fails to show counsel could have had no rational basis for the opening statement's content.

### b.     *Response to various prosecution witnesses' testimony*

Under the subheading of "Cross-examination," Roman challenges defense counsel's performance in regard to the examination of uncle, uncle's wife, and the sheriff's deputy. In fact, most of what Roman challenges is counsel's failure to object to various testimony on direct by these witnesses, and he mostly fails to specify what cross-examination was missing. No deficient performance appears.

First, Roman suggests that defense counsel should have objected to uncle's testimony that on the night in question, Roman was acting as he normally did because "he always did that with other people. He gets a little violent. He did that with one of the kids, with a healthcare provider. He got into an argument like that. He want[s] to fight him. He want[s] to fight." According to Roman, counsel could have objected based on uncle's lack of personal knowledge. But immediately before this testimony, defense counsel unsuccessfully objected to the prosecutor's question about whether uncle was familiar with "the way that [Roman] normally acts and what his usual demeanor is," which uncle then answered in the affirmative. Thus, a personal-knowledge objection would have been futile and was not necessary to render effective assistance. (See *People v. Diaz* (1992) 3 Cal.4th 495, 562.)

Roman also argues that defense counsel could have objected to the same testimony by uncle on the basis that it was character evidence. Roman makes little effort to show that the testimony was subject to exclusion, citing only Evidence Code section 1101 and another case generally stating that

16

character evidence is inadmissible. (*People v. Felix* (1999) 70 Cal.App.4th 426, 432.) Even if the testimony was inadmissible, " ' "[w]hether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence." ' " (*People v. Majors* (1998) 18 Cal.4th 385, 403.) Counsel had just made an unsuccessful objection, and uncle's vague description of Roman's previous violence was hardly damning. Thus, counsel could have reasonably decided to keep quiet instead of drawing further attention to the testimony.

As for cross-examination, Roman identifies a few questions that he asserts defense counsel should have asked uncle, including "whether he was in fact stronger than [Roman], or whether at [10] years [Roman's] senior he still had the strength to knock [Roman] down and strike [his] head repeatedly." But Roman makes no attempt to demonstrate that no reasonable counsel would have let these questions pass. Otherwise, referring to all three witnesses, Roman generally states that their testimony was "entirely untested," and he claims that counsel should have "challenge[d] the multiple descriptions of a 'stabbing' or a 'knife wound.' " This is insufficient to carry Roman's burden to establish ineffective assistance. We decline to comb uncle's testimony for such language or speculate on how counsel might have otherwise cross-examined him more effectively. Likewise, we do not consider similarly general complaints about the testimony of the other two witnesses.

Turning to uncle's wife, Roman complains that defense counsel "did not object once" during her direct examination. Roman states that "[a] leading or personal knowledge objection would have been appropriate" when the prosecutor asked her questions referring to uncle's "stab wounds" and having

17

"been stabbed," but again, he does not cite any authority suggesting that such objections were required to render effective assistance. Roman also complains that defense counsel asked uncle's wife only one question on cross-examination—to confirm she was not a percipient witness to the fight—but again does not identify what other cross-examination should have occurred. Especially given that uncle's wife was a relatively minor witness, we cannot conclude that defense counsel's failure to question her further was inadequate. (See *People v. Bolin* (1998) 18 Cal.4th 297, 334 [matters such as " 'whether certain witnesses should have been more rigorously cross-examined . . . are normally left to counsel's discretion' "].)

Finally, Roman contends that defense counsel's response to the sheriff deputy's testimony was deficient. Roman lists numerous objections he claims should have been made to the deputy's testimony and associated exhibits, but he does not explain why the objections would have been well-taken. Indeed, for some of them he does not even identify what their basis would have been. Again, this is simply insufficient to carry his burden on appeal to demonstrate ineffective assistance of counsel.

As for cross-examination, Roman claims that defense counsel should have "probed how [the sheriff's deputy] knew what he observed [at the scene] was blood." But as Roman acknowledges, counsel successfully elicited the deputy's testimony that he was "unsure" whose blood it was, and there was little to be gained by calling into question whether what the deputy observed was blood at all. Indeed, the admission of numerous photographs showing a lot of blood on uncle made it highly unlikely the jury would question the deputy's conclusion that the substance was blood.

In sum, Roman fails to show that defense counsel performed deficiently in responding to these three witnesses' testimony.

### c. *Failure to present additional evidence*

Roman also complains that defense counsel rested the defense entirely on Roman's own testimony. Noting that counsel did not question him on redirect, Roman infers that counsel "believed that [Roman's] story had been compellingly told on direct examination, or at the least could not be improved." According to Roman, however, "this was the most basic presentation of a defense imaginable," and counsel should have presented evidence corroborating Roman's story or undermining uncle's.

As Roman recognizes, "[a] defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense." (*People v. Welch* (1999) 20 Cal.4th 701, 728.) Moreover, Roman does not identify which evidence bolstering his story or undermining uncle's should have presented. Thus, we are unable to evaluate " 'the substance of the omitted evidence and its likelihood for exonerating [him],' " and in turn to determine whether counsel's performance was deficient. (*People v. Bolin, supra*, 18 Cal.4th at p. 334.)[7]

---

[7] Elsewhere in his briefing, Roman states that defense counsel could have "call[ed] an expert to ask what other types of instruments might cause . . . [uncle's] puncture wound[s], whether that might occur from a sharp object sticking out of the ground, or if there was any way to know specifically what it was that had caused the injur[ies]." Since the record does not indicate that any expert witness was available who would testify along these lines, we cannot presume that counsel had no rational basis for not presenting such testimony. Similarly, Roman's claim that counsel's failure to present any witnesses other than Roman himself "demonstrated both a lack of preparation and poor judgment" is too vague to establish ineffective assistance.

### d.  *Performance related to instructing on self-defense*

Roman also challenges defense counsel's strategy about whether the jury should be instructed on self-defense.[8]  At the conference on jury instructions, the trial court stated it had a duty to instruct sua sponte on self-defense if there was some supporting evidence, which the court thought there was based on Roman's testimony that uncle started the fight.  Defense counsel objected to giving a self-defense instruction, explaining his view that "this [was] . . . fighting in public[,] . . . not self-defense," and the instruction would "muddy the waters."  Expressing confusion as to why counsel would not want Roman to have "the protections of a self-defense instruction," the court indicated it planned to give the instruction.

The following day, the trial court gave the attorneys instruction packets that included CALCRIM No. 3470, the standard instruction on self-defense for non-homicide crimes.  After the prosecutor took the position that the self-defense instruction should be given, defense counsel responded that he now agreed and thought the court should give the instruction "[i]n [an] abundance of caution."  Ultimately, the jury was instructed under CALCRIM No. 3470 that Roman was not guilty of assault if he acted in lawful self-defense.  It was also instructed under CALCRIM Nos. 3471 and 3472 on mutual combat and contriving a fight.

---

[8] In addition, Roman mentions defense counsel's failure to object to another jury instruction, CALCRIM No. 3145, which pertained to the allegation that he personally used a deadly or dangerous weapon.  In particular, Roman suggests that the instruction given should not have included optional language addressing inherently deadly weapons, since " 'a knife is not an inherently dangerous or deadly instrument as a matter of law.' " (*People v. Aledamat* (2019) 8 Cal.5th 1, 6.)  He does not, however, develop any argument that this failure to object constituted ineffective assistance of counsel.

Roman claims that "by ultimately relenting to the self-defense instruction . . . but presenting no evidence or argument in support, trial counsel prevented an easy ineffective assistance of counsel claim"—based on opposing the instruction—"but condemned [him] to have the defense ignored. This was the worst of both worlds." Of course, "prevent[ing] an easy ineffective assistance of counsel claim" is not ineffective assistance. The trial court was prepared to instruct the jury on self-defense regardless of whether defense counsel objected, and it was not deficient performance for counsel to initially oppose the instruction and then change his mind.

Having no valid objection to counsel's eventual decision not to oppose the self-defense instruction, Roman also fails to show that counsel could have no legitimate reason for not arguing self-defense once the jury was instructed on those principles. Choosing to focus on the rebar explanation and not argue self-defense, which counsel believed was not established, was a rational tactical decision. (See *People v. Thomas* (1992) 2 Cal.4th 489, 531 ["Failure to argue an alternative theory is not objectively unreasonable as a matter of law"].) Moreover, Roman fails to identify the "evidence in support" of self-defense that he contends counsel should have presented. No deficient performance appears.

### e. *The defense's closing argument*

Roman next claims that defense counsel rendered ineffective assistance by giving a deficient closing argument. We are not persuaded.

Although a defendant has the right to effective assistance of counsel in closing argument, "counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in [counsel's] closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should 'sharpen

21

and clarify the issues for resolution by the trier of fact,' [citation], but which issues to sharpen and how best to clarify them are questions with many reasonable answers." (*Yarborough, supra,* 540 U.S. at pp. 5–6.) Indeed, counsel may provide effective assistance even if deciding "to forgo closing argument altogether." (*Id.* at p. 6.)

Echoing his challenge to the opening statement, Roman faults defense counsel for mentioning reasonable doubt but not "explain[ing] why [uncle's] story led to reasonable doubt." During closing argument, counsel argued that "this case is oozing with reasonable doubt" and reminded jurors that they had to have "an abiding conviction" that the charges were true to convict. He also relayed an anecdote about his mother being a holdout juror in a criminal case because she "was not convinced beyond a reasonable doubt." He then detailed the evidence supporting the conclusion that uncle's injuries were caused by the rebar, not a knife, including the photographs of the rebar and uncle's testimony that he never saw a knife.

Thus, the clear thrust of the closing argument was that the jury should not convict because there was an alternative explanation for uncle's injuries, even though defense counsel did not state in so many words that the highlighted evidence created reasonable doubt about whether Roman was guilty. Although Roman imagines other possible reasons for the jury to believe him instead of uncle, there is no requirement to include every conceivable argument in closing. (See *Yarborough, supra,* 540 U.S. at p. 7 ["[f]ocusing on a small number of key points may be more persuasive than a shotgun approach"].) It may be that counsel could have improved his closing argument, but he hardly "sandbagg[ed]" Roman's story.

Roman also objects to the discussion of his relationship with uncle and defense counsel's praise of uncle's care for mother. A fair amount of the

closing argument focused on uncle and Roman's relationship, which was originally good before "they drifted apart." After alluding to uncle's being "upset" when Roman moved onto mother's property, counsel stated, "I personally was touched by [uncle's] testimony about the care that he gave to his [sister]. . . . [T]hat was a very loving relationship." Then, after noting that uncle and Roman encountered each other on the night in question while uncle was caring for mother, counsel said, "Due to probably previous bad blood there was kind of a huffing and puffing and words were exchanged. Bad words were exchanged. They decide to take it outside."

According to Roman, this portion of the closing argument was deficient because defense counsel "described [uncle] sympathetically . . . before pivoting to the animosity between the two men," so that "[t]he jury was left to wonder what sort of person would have 'bad blood' with such a saint." Roman also argues that "there can have been no reason to build up the animosity between the two men" since counsel did not argue self-defense.

As a tactical matter, defense counsel could have decided it was beneficial to acknowledge uncle's care of mother. There was little to lose by mentioning it and thereby appearing fair to the victim. (See *People v. Mayfield* (1993) 5 Cal.4th 142, 177 ["candor may be the most effective tool available to counsel"].) Moreover, that the two men had a fight was undisputed, and the defense focused on creating reasonable doubt about whether Roman had a knife. Uncle's care of mother tended to suggest that, although he and Roman fought, Roman would have no good reason to attack him with a knife. As for Roman and uncle's strained relationship and "bad blood," counsel could have reasonably decided that it was preferable to suggest to the jury that both men were responsible for the fight and spontaneously initiated it, again undercutting the conclusion that Roman

23

armed himself beforehand.  Since the challenged portions of the closing argument could have been based on reasonable tactical decisions, they do not constitute ineffective assistance of counsel.

### f.    *Misleading information provided by counsel*

Roman also claims that defense counsel misled him by telling him he could not fire counsel.  A month after the verdicts were returned but before sentencing, Roman sought to replace counsel with another attorney.  The trial court explained that because his attorney was privately retained, Roman could "hire or fire counsel at [his] pleasure."  Roman responded, "I was told otherwise by counsel.  He said I could not fire him.  That doesn't make any sense.  I was under the understanding that you can hire and fire an attorney if you hired him; he said I couldn't."  Stating that it was "not even going to permit [Roman] to even talk about it at this time," the court continued the matter and later appointed a public defender to represent Roman at sentencing.

As Roman effectively recognizes, his unsworn statement that defense counsel said counsel could not be fired is insufficient to support a claim of ineffective assistance of counsel.  The burden is on a defendant to establish such a claim, and " ' "[t]he proof . . . must be a demonstrable reality and not a speculative matter." ' "  (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1007; see, e.g., *In re Alvernaz* (1992) 2 Cal.4th 924, 938 ["defendant's self-serving statement" about being misled by counsel insufficient unless corroborated].)  It does not matter whether it is "believable," given his performance as a whole, that defense counsel told Roman he could not be fired.  In this direct appeal, we cannot engage in factfinding about what counsel actually said.  Therefore, this aspect of Roman's claim fails.

*g.      Other irregular aspects of counsel's representation*

Finally, Roman highlights various points at which he claims defense counsel betrayed ignorance of basic criminal procedure or otherwise performed incompetently. For example, counsel made a pretrial request for the trial court to dismiss the prior-strike allegation, even though a *Romero* motion at sentencing is the normal method for seeking to strike a strike. Trial on the strike allegation was bifurcated, and when that part of the proceeding was being discussed, defense counsel said, "The bifurcation is on damages, right?," even though damages are obviously not an issue in a criminal case.

Roman's briefing is also sprinkled with references to other eyebrow-raising moments, such as defense counsel's ending his closing argument as follows: "So in conclusion, I want to quote my favorite fictional character. Master Yoda from . . . Star Wars. If he were here, he would say, 'Lack of evidence there is. Reasonable doubt there is. Not guilty verdict you must.' " As another example, counsel repeatedly failed to keep track of which jurors were available to dismiss while exercising his peremptory challenges.

But Roman makes no effort to demonstrate that any of these instances actually amounted to ineffective assistance of counsel. It is insufficient to point out questionable aspects of counsel's performance and leave the reviewing court to draw its own inferences. A defendant must explain *why* counsel's representation was objectively unreasonable, with references to authority, and *how* the defendant was thereby harmed, with references to the record. Roman's briefing falls short of this standard in regard to much of the performance he challenges.

3. Aspects of counsel's performance assumed deficient

Having concluded that most of the objected-to performance was not objectively unreasonable, we turn to the two remaining aspects of Roman's ineffective-assistance claim: defense counsel's voir dire and the decision not to object to admission of the hospital records.

a. *Voir dire*

Roman argues that defense counsel "largely failed to participate in voir dire," primarily questioning jurors about a single irrelevant topic. Assuming that counsel thereby performed deficiently, we reject the claim because Roman fails to demonstrate resulting prejudice.

Voir dire occurred over three days in October 2021 and included about 50 prospective jurors. Each new group of jurors was first questioned by the trial court, which asked general questions about various topics, including biographical data, previous experiences with jury service and law enforcement, and potential familiarity with the case.

Roman's claim focuses on a particular line of questioning defense counsel pursued. Counsel's first question of a prospective juror was the following: "Currently there's a crisis going on at the border in [Del Rio], Texas, involving people that want to come over to this country. And there are images in the news of being chased by law enforcement officers. Do you have an opinion about that?" The prosecutor objected, but the question was allowed to stand. The juror responded that it was "a politically loaded question," he thought "illegal immigration" was "a very serious problem," and people should enter the country "in a proper and vetted way."

Defense counsel asked the same question of the other 15 prospective jurors in the first group, drawing answers ranging from support for immigration to approval for barring illegal entry to ignorance of the issue.

26

Before answering, one juror asked whether counsel was "talking about the border in general" or recent events, and counsel responded, "The recent Haitian [sic] is what the focus of the question was." Several jurors then addressed the immigration of Haitians in particular, referring to such things as "the news reports showing the Haitians under the bridge gathering." Counsel did not ask any other questions.

Before beginning to question the same group, the prosecutor stated: "The first thing I'm going to tell you is that if you sit down on this jury, the situation at the border is going to have absolutely nothing to do with the decision that you make in this case. You're going to be swearing to evaluate the witnesses that you hear impartially. Racial bias or your opinions on politics are not to enter into a decision at all. . . . [¶] You're going to hear from some people in this case. Some of them might be Latino. Some of them might be Caucasian. That has nothing to do with your finding of facts in this case. You're going to listen to them impartially and racial prejudice one way or the other—in favor, not in favor—is to have absolutely nothing to do with your decision here."

Defense counsel did not ask any questions of the next group of jurors, except for a single question to one juror who recognized uncle's common last name. For the following group, counsel returned to his previous line of questioning, stating, "To the new people, just the question that I've asked before . . . of all jurors, and that's pointing out a current event that's currently going on at the border in Texas. People wanting to leave their country and come into our country. And . . . there's some resistance to that by local law enforcement. And I just wondered if any of you have . . . an opinion about that?"

After expressing sympathy for "all the people trying to come here to better their lives," the first juror to answer alluded to a photograph in the media that defense counsel might have in mind. The juror stated that it appeared to show a law enforcement officer "whipping somebody[, b]ut if you look at the same picture from a different angle, he's not. The horse reins are not even touching the person who's running. Either way, it's got to be a horrifying experience for that person to go through." The remaining two new jurors also referred to the photograph, stating they thought it did not reflect well on the United States. The prosecutor responded by confirming with these jurors that they agreed their political opinions had nothing to do with whether the charged crime occurred.

Defense counsel did not ask any more potential jurors about the immigration issue, meaning he questioned fewer than half of the total venire about it. He did pose other questions to individual jurors. For example, when two jurors disclosed certain traumatic experiences privately, he asked follow-up questions about whether they could be impartial despite those experiences. He also asked one juror about the experience of being an alternate juror in a different case and another about whether she "might dominate the jury one way or the other" since she was an attorney. Overall, however, counsel pursued little questioning beyond the immigration topic.

Criminal defendants have a state and federal constitutional right to an impartial jury. (*People v. Martinez* (2009) 47 Cal.4th 399, 425.) " 'Among the most essential responsibilities of defense counsel is to protect [the] client's constitutional right to a fair and impartial jury by using voir dire to identify and ferret out jurors who are biased against the defense.' " (*Miller v. Webb* (6th Cir. 2004) 385 F.3d 666, 672; *Rosales-Lopez v. United States* (1981) 451 U.S. 182, 188.) Like many other strategic aspects of representation,

28

counsel's voir dire is given deference. (*Miller*, at p. 672; see *People v. Cunningham, supra*, 25 Cal.4th at p. 1004 [not asking certain questions on voir dire may be "the result of a sound tactical decision"].) Nonetheless, there must be "sufficient questioning to produce some basis for a reasonably knowledgeable exercise of the right of challenge," even if the questioning is "by the trial judge alone." (*People v. Boulerice* (1992) 5 Cal.App.4th 463, 477.)

We agree with Roman that defense counsel's voir dire was, to put it bluntly, "somewhat bizarre." The Attorney General argues that the immigration line of questioning "pertain[ed] to the facts of this case in some discernible fashion," because Roman and defense counsel are "of Latin American descent" and the questioning was "designed to evaluate the jury pool for bias against immigrants and/or Latin Americans." But the people gathering at the border in October 2021 were mostly Haitians—or at least counsel thought they were—and the record does not reflect that either Roman or counsel is an immigrant. Thus, it is difficult to discern how this line of questioning would be effective for uncovering bias against Roman and defense counsel. Indeed, after single-mindedly pursuing this topic with jurors, counsel eventually abandoned it, suggesting even he realized it was not fruitful. Counsel did ask individual jurors other stray questions, but he mostly left voir dire to the trial court and the prosecutor.

Nonetheless, we need not decide whether defense counsel's voir dire fell below prevailing professional norms, because Roman fails to demonstrate any prejudice resulted. He claims that counsel's voir dire "resulted in a diminished ability to apply a reasonably knowledgeable exercise of the right of challenge" and "was one of many lost opportunities to affect in any meaningful way the shape and outcome of this trial." But "mere speculation that additional questioning might have disclosed a ground for challenge is

insufficient to warrant relief" (*People v. Kipp* (1998) 18 Cal.4th 349, 368), and "[n]othing in the record suggests the actual jury was biased, or that it is reasonably probable a different jury would have been more favorably disposed towards [Roman]." (*Freeman*, *supra*, 8 Cal.4th at p. 487.) Indeed, both the trial court and the prosecutor conducted a thorough voir dire, and defense counsel had plenty of information on which to exercise peremptory challenges even though he did not personally elicit it. (See *People v. Boulerice*, *supra*, 5 Cal.App.4th at p. 477.) Thus, we have no basis to conclude that counsel's voir dire negatively affected the trial's outcome.

### b. *Not objecting to hospital records*

Next, we turn to Roman's claim that defense counsel rendered ineffective assistance by not objecting to hearsay statements in uncle's hospital records.[9] Before trial, the prosecutor argued that the records, including their references to "stab wounds" and "knife wounds," were admissible under Evidence Code section 1271, the business-records exception to the hearsay rule. Defense counsel agreed that the records were admissible as such, and the trial court ruled they could be introduced "[a]s stipulated." According to Roman, however, counsel could have objected to the challenged statements on the basis that they were inadmissible under Evidence Code section 1271.[10]

The failure to object to evidence " 'usually involve[s] tactical decisions on counsel's part and seldom establish a counsel's incompetence.' " (*People v.*

---

[9] In raising this claim, Roman correctly notes that his trial counsel did not file any motions in limine. But Roman does not identify any motions he believes counsel should have brought or otherwise attempt to demonstrate that this omission constituted deficient performance.

[10] Roman also claims that defense counsel should have objected to the statements as unduly prejudicial under Evidence Code section 352, but we

*Roberts* (2011) 195 Cal.App.4th 1106, 1131; *Freeman*, *supra*, 8 Cal.4th at pp. 490–491.) As *Roberts* observed, courts "routinely" reject claims that counsel rendered ineffective assistance by not objecting to evidence "on the bases that the unasserted objection was nonmeritorious and would have been overruled" or there was "a tactical reason for defense counsel's failure to assert the objection." (*Roberts*, at p. 1131.) The Attorney General claims that Roman's proposed objections lack merit but does not identify any other tactical reason counsel could have had for conceding that the challenged statements in the hospital records—which negatively affected the defense's position on the main contested issue—were admissible. Thus, we focus on whether an objection would have been well-taken.

Under Evidence Code section 1271, "[e]vidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event" if four requirements are met: (1) "[t]he writing was made in the regular course of a business"; (2) "[t]he writing was made at or near the time of the act, condition, or event"; (3) "[t]he custodian or other qualified witness testifies to its identity and the mode of its preparation"; and (4) "[t]he sources of information and method and time of preparation were such as to indicate its trustworthiness." (Evid. Code, § 1271; *Conservatorship of S.A.* (2018) 25 Cal.App.5th 438, 447.)

The prosecutor argued below that the statements characterizing uncle's wounds were admissible as business records under *People v. Beeler* (1995) 9 Cal.4th 953. There, the Supreme Court rejected the claim that an autopsy report containing a pathologist's medical opinions was inadmissible under Evidence Code section 1271. (*Beeler*, at p. 980.) Relying on earlier decisions,

need not evaluate that contention because we will assume there was a valid hearsay objection to be made.

*Beeler* distinguished between " 'diagnoses [that] are a statement of a fact or a condition, for example, a diagnosis [of] . . . a compound fracture of the femur,' " and diagnoses that are " 'but the reasoning of the person making [them] arrived at from the consideration of many different factors,' " such as "subjective psychiatric opinion[s]." (*Id.* at pp. 980–981.) The Supreme Court concluded that the pathologist's "conclusion regarding the cause of death—a bullet wound to the heart—was based on his direct observation and [was] no different in kind from a diagnosis of a broken femur," meaning it was admissible under Evidence Code section 1271. (*Beeler*, at p. 981.) The same was true of the pathologist's observations about the victim's " 'gunshot wound[s],' " which were likewise "observed fact[s]." (*Ibid.*)

Roman argues that defense counsel could have objected to the challenged statements on the ground that under *People v. Beeler, supra,* 9 Cal.4th 953, " 'knife' and 'stab' are words that do not record an act, condition[,] or event known to . . . medical personnel, and are not a diagnosis." Roman claims these characterizations of uncle's wounds were double hearsay because "whoever created the medical record did not have personal knowledge of a 'knife' or 'stab' wound, as there were no bystanders to the event." We tend to agree that the statements were not admissible under *Beeler*. Even if akin to those in *Beeler*, it is unclear whether the wound characterizations here were even based on medical personnel's own observations, as opposed to uncle's report of what happened. Thus, the characterizations are distinguishable from the opinions in the *Beeler* report, which were clearly based on the pathologist's own observations.

But even if we assume that defense counsel had no rational basis for not objecting to the challenged statements in the hospital records, we disagree with Roman that the omission was prejudicial. As discussed above,

the jury had ample other evidence before it that uncle was stabbed, including uncle's testimony and the photographs of his wounds, and the rebar explanation was also extremely weak.  Thus, there is no reasonable probability of a different result had the statements been excluded.

### c.     *Cumulative prejudice*

Finally, we reject Roman's claim of cumulative prejudice.  Defense counsel did not perform well in some respects, but the only objectively inadequate performance that we assume occurred was counsel's voir dire and his failure to object to hearsay in the hospital records.  As discussed above, Roman is unable to demonstrate any prejudice at all from the voir dire, and the failure to object to the hospital records was harmless.  Thus, there is no cumulative prejudice.

## III.
### DISPOSITION

The judgment is affirmed.

_____

Humes, P.J.


WE CONCUR:


_____

Margulies, J.


_____

Bowen, J.*


\*Judge of the Superior Court of the County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*People v. Roman*  A164943